Rel: October 31, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

————————————————

### SC-2024-0121

————————————————

**Nissan North America, Inc., and Nissan Motor Co., Ltd.**

**v.**

**Alise Henderson-Brundidge**

**Appeal from Mobile Circuit Court**
**(CV-20-901869)**

COOK, Justice.

Alise Henderson-Brundidge ("Alise") sued Nissan North America, Inc., and Nissan Motor Co., Ltd. (referred to collectively as "Nissan"),

asserting, among others, a claim under the Alabama Extended Manufacturer's Liability Doctrine ("the AEMLD"). Specifically, she alleged that Nissan had manufactured a defective airbag system and that she was seriously injured as a result of that defective airbag system. The jury returned a $8.5 million verdict in favor of Alise on her AEMLD claim. After the verdict, Nissan discovered that two members of the jury panel had failed to disclose, when asked to do so during voir dire, that they had each been named as defendants in multiple civil lawsuits. Nissan subsequently filed a renewed motion for a judgment as a matter of law or, in the alternative, motions for a new trial or for a remittitur.

The Mobile Circuit Court denied those motions. First, it concluded that, because Alise had presented substantial evidence in support of her AEMLD claim, Nissan was not entitled to a judgment as a matter of law.

As to the motion for a new trial, the trial court explained that, "[i]f given a free hand, [it] would grant the motion for new trial upon a finding that the failure of the two jurors to truthfully respond resulted in probable prejudice," but it stated that this Court's decisions in Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So. 2d 1 (Ala. 2007), and Hood v. McElroy, 127 So. 3d 325 (Ala. 2011), left it with no choice but to

deny Nissan's motion for a new trial. The trial court also denied Nissan's alternative request for a remittitur.

Nissan now appeals to this Court. After carefully considering the briefs and the record on appeal, we affirm the trial court's denial of Nissan's motion for a judgment as a matter of law. However, because we conclude that the trial court declined to exercise its discretion based on an erroneous belief that our decisions in <u>Jimmy Day Plumbing</u> and <u>Hood</u> deprived it of any discretionary power, we reverse the denial of Nissan's motion for a new trial and remand the case to allow the trial court to exercise its discretion, guided by the principles enunciated below.

<u>Facts and Procedural History</u>

On October 5, 2018, Alise was riding to her mom's workplace with Lola Rodriques, a school friend, and Lola's younger sister Nyla. Lola was driving Alise and Nyla in a 1998 Infiniti QX4. Alise was in the front passenger seat, wearing a seat belt, and Nyla was in the back seat. Lola was traveling in the left-hand turning lane on McVay Drive in Mobile when a 2015 Ford Fusion, exiting the parking lot of a Shell gas station and attempting to proceed north on McVay Drive, crossed traffic and

collided with her vehicle.[1] Although the collision was relatively minor, Alise suffered serious injuries to her eyes when the Infiniti's front passenger airbag deployed and struck her in the face. Although Alise slowly regained vision in her right eye, she suffered irreparable and permanent vision loss in her left eye, rendering her blind in that eye.

In October 2020, Kelley Morgan, as mother and next friend of Alise, commenced an action against Nissan in the Mobile Circuit Court.[2] Her complaint asserted a product-liability claim under the AEMLD, claims of negligent and wanton design, and claims of negligent and wanton failure to warn.[3] More specifically, the complaint alleged that Alise suffered

---

[1]When the vehicles collided, the Fusion was traveling about seven miles per hour and the Infiniti was traveling about 14 miles per hour.

[2]At the time of the accident, Alise was 15 years old and a sophomore in high school. Alise was still a minor when the case was commenced. However, she reached the age of majority while the case was pending, and the trial court substituted Alise as the named plaintiff before opening statements on the second day of trial.

[3]In the complaint, Alise, Lola, and Nyla, through their respective mothers and next friends, also asserted claims against Cassie Marie Sowa, the driver of the Fusion. Lola and Nyla separately asserted a claim against State Farm Mutual Automobile Insurance for uninsured-motorist or underinsured-motorist benefits. The claims against Sowa were subsequently dismissed, and Lola and Nyla later settled their claim

severe injuries as a result of the Infiniti's defective airbag system and sought damages for permanent injury, disfigurement, pain and suffering, mental anguish, and loss of enjoyment of life.

## I. Voir Dire

On June 6, 2023, the case proceeded to trial on Alise's AEMLD and negligence claims against Nissan.[4] A venire of 36 persons was sworn and empaneled. J.B. and F.W. were among the prospective jurors. The trial court questioned the venire first, followed by counsel for Alise. Alise's counsel asked the venire if "anyone ever filed a lawsuit before where you were a Plaintiff in a lawsuit." Several prospective jurors responded affirmatively. Among them was J.B., who stated that she had been a plaintiff in a class-action suit against a financing company and that her son had been a plaintiff in a suit against the Boy Scouts.

Counsel for Alise then asked:

---

against State Farm. Thus, all the claims but those asserted by Alise against Nissan were disposed of in the course of proceedings.

[4]Shortly before trial commenced on June 6, 2023, the trial court entered a summary judgment in favor of Nissan on Alise's wanton-design and negligent- and wanton-failure-to-warn claims -- leaving only Alise's AEMLD and negligent-design claims against Nissan for the jury to decide.

"Let's switch it around. <u>Has anyone ever been sued before? Anyone ever been sued before?</u>"

(Emphasis added.) Only prospective juror C.J. responded affirmatively to that question, stating that she had been sued following an accident that took place when her brother was driving her car.

After that response from C.J., counsel for Alise again asked the venire: "Anybody else been sued?" No one else responded. When counsel for Alise subsequently asked if any of the prospective jurors had ever experienced an airbag deploying while in a vehicle, C.J. disclosed that she had suffered eye injuries because of the chemicals released from a deployed airbag in her vehicle. Counsel for Alise later asked the venire if any of them had a close relative or friend who had lost their eyesight due to an accident. In response, J.B. disclosed that her older sister had suffered total vision loss in her left eye after a bottle rocket landed in that eye.

Counsel for Nissan questioned the venire next. Nissan's counsel did not ask the prospective jurors about their litigation histories, noting that counsel for Alise had "asked a lot of my questions so [his] list got shorter." Counsel for Nissan, however, did ask J.B. to confirm that she was a

"former legal secretary," and J.B. responded that she had previously worked as a legal secretary.

Following voir dire, the parties selected the jury. Nissan exercised strikes against eight members of the venire. Nissan struck C.J., the prospective juror whose eyes had been injured when an airbag deployed during a car accident and the only prospective juror who had answered the question about having previously been sued. Both J.B. and F.W. were chosen to sit on the jury.

II. The Evidence at Trial on Alternative Design

At trial, Alise introduced evidence in support of her AEMLD claim. As relevant here, to prevail on her AEMLD claim, Alise was required to present evidence "establishing the existence of a safer, practical, alternative design for the allegedly defective product …." Hosford v. BRK Brands, Inc., 223 So. 3d 199, 208 (Ala. 2016).

On the stand, William Broadhead, Alise's airbag expert,[5] testified

---

[5]On appeal, Nissan does not dispute Broadhead's qualifications. Nissan also does not argue that his opinions should have been excluded pursuant to Rule 702(b), Ala. R. Evid., § 12-21-160, Ala. Code 1975, and the Daubert standard. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Nissan did make such a motion before the trial court, but it did not argue this point on appeal.

that the Infiniti's airbag deployed unnecessarily, too late, and too forcefully. Specifically, Broadhead offered the following observations and opinions:

1. The Infiniti's threshold for airbag deployment was far too low, firing unnecessarily in low-speed collisions.

2. The Infiniti had a 9.1 mph barrier equivalent velocity when it collided with the Fusion.

3. A 9.1 mph barrier equivalent velocity did not warrant airbag deployment, especially for a belted occupant like Alise.

4. Nissan could have used dual-threshold sensors that would have raised the initial deployment threshold when a passenger wears a seatbelt, and this alternative was available at the time Nissan manufactured the Infiniti.

5. In addition to deploying unnecessarily, the airbag fired too late, as evidenced by Alise's facial injuries as well as the pattern of her makeup on the airbag.

6. To be timely, and to ensure that an airbag fully inflates before coming into contact with an occupant's face, airbags should fire at least 30 milliseconds before an occupant's head moves forward five inches in a collision.

7. Because an occupant's head will move five inches within 49 milliseconds, an airbag should fire within 19 milliseconds at the latest so that the airbag is inflated by the time the occupant's head moves into the deployment zone.

8. Nissan admitted that the Infiniti's airbag was firing (as opposed to fully inflating) from 63 to 101 milliseconds after

the crash took place.

9. The delayed deployment was the result of inadequate crash sensors on the car.

10. The Infiniti had only one sensor located in the compartment between the driver and the passenger.

11. The safer alternative design was to place multiple sensors on the car, including a front-end sensor to avoid a situation (like Alise's) where the collision was already in progress before the compartment sensor alerted.

12. In 1997, the majority of vehicles on the road had multiple sensors, so the alternative was available to Nissan.

13. The Infiniti's airbag was also too powerful.

14. In March 1997, months before the Infiniti was manufactured, the National Highway Traffic Safety Administration ("NHTSA") amended Federal Motor Vehicle Safety Standard 208 to require automakers to depower bags because of the high potential for injuries.

15. Nissan could have depowered the Infiniti's airbag but did not do so.

16. Alise would not have been injured as severely if a depowered airbag had been installed in the Infiniti.

17. Nissan could have used tethers to restrict the reach and force of the airbag.

In sum, Broadhead identified four purportedly safer alternative designs for the airbag system that caused Alise's injuries: (1) a dual-

threshold system with a higher deployment threshold for belted occupants, (2) additional sensors in the front of the Infiniti to allow for timely deployment of the airbag, (3) a less powerful airbag, and (4) tethers designed to control the inflation and shape of the deploying airbag.

### III. Nissan's Postjudgment Motions

The jury, after considering the above-mentioned evidence, found for Alise on her AEMLD claim against Nissan[6] and awarded her $8.5 million in compensatory damages. On June 19, 2023, the trial court entered a judgment on the $8.5 million jury verdict for Alise. Following the entry of that judgment, Nissan discovered that two jurors, J.B. and F.W., did not disclose their litigation histories in response to direct questioning during voir dire.[7] Specifically, although J.B. and F.W. did not respond in any way when asked at voir dire if they had "ever been sued before," counsel for Nissan

---

[6]The jury returned a verdict in favor of Nissan as to Alise's negligent-design claim.

[7]There is no evidence before this Court indicating that the information regarding J.B.'s and F.W.'s litigation histories was known to Nissan before or during trial.

10

"discovered that Juror J.B. had been sued three times in small claims court on debts of $1,584.00, $2,853.00, and $2,338.00 in 2017, 2019, and 2020. Two of these suits resulted in consent judgments and one was dismissed."

Nissan's counsel also learned that

"Juror F.W. was sued in small claims court in 2000 and 2021 for $1,383.00 and $1,565.00, both of which resulted in default judgments. [Juror F.W.] was also sued [for] unlawful detainer in 2005 and again in 2008. One of these suits resulted in a default judgment and the other was dismissed."

On July 19, 2023, Nissan filed a renewed motion for a judgment as a matter of law or, in the alternative, a motion for a new trial or for a remittitur. In support of its motion for a new trial, Nissan submitted an affidavit indicating that Nissan's attorney would have chosen to strike J.B. and F.W. had he known of J.B.'s and F.W.'s litigation histories, and Nissan argued that J.B.'s and F.W.'s failure to disclose on voir dire that they had each been named as defendants in civil lawsuits warranted a new trial. Nissan's renewed motion for a judgment as a matter of law further argued that Alise had failed to present substantial evidence of the necessary elements of her AEMLD claim. Finally, Nissan's motion for a remittitur urged that the jury's $8.5 million verdict was excessive and due to be reduced.

11

On August 3, 2023, the parties filed a "Joint Stipulation to Extend [the] A.R.C.P. 59.1 Deadline" by 30 days. On October 11, 2023, the parties filed an "Amended Joint Stipulation to Extend [the] A.R.C.P. 59.1 Deadline" by an additional 30 days. Then, on December 15, 2023, Alise filed a "Joint Motion for Thirty-Day Extension for Ruling on Post-Trial Motions." That joint motion sought to extend the deadline for ruling on Nissan's postjudgment motions until January 17, 2024.

IV. <u>The Trial Court's Order</u>

On January 16, 2024, the trial court entered a lengthy, and rather unconventional, order denying Nissan's postjudgment motions. In that order, the trial court noted that, of all the arguments raised by Nissan, it considered the challenge based on J.B.'s and F.W.'s failure to respond to "a very clear question regarding prior litigation" to "have the most merit."

Significantly, the trial court made a number of factual findings in favor of Nissan's claim that it was prejudiced by J.B.'s and F.W.'s failure to respond to the voir dire question and indicated that, if it were up to the trial court, it would grant Nissan's motion for a new trial. In its order, the trial court first noted that, in determining whether a juror's failure to answer a voir dire question warrants a new trial, courts consider the

12

ambiguity of the question posed, the temporal remoteness of the matter inquired about, the prospective juror's inadvertence or willfulness in falsifying his or her answer or in failing to answer, and the materiality of the matter asked about. Applying those factors, the trial court found as follows:

> "Temporal Remoteness
>
> "Juror J.B.'s suits were filed against her in 2017, 2019, and 2020. They are not remote. Juror F.W.'s suits were brought in 2001, 2005, 2008, and 2021. The first three are remote. The last is not.
>
> "The Ambiguity of the Question Asked
>
> "The question was not ambiguous and the Court cannot and will not assume any juror was confused by such a simple question, asked three times without contradiction.
>
> "The Potential Juror's Inadvertence or Willfulness in Not Responding
>
> "The Court has no way of knowing if the failure of either juror was intentional or accidental because there is no testimony from either juror. However, there is evidence Juror J.B. worked as a legal secretary, making it somewhat hard to believe she didn't understand or that her failure to respond was inadvertent.
>
> "The Failure of the Juror to Recollect
>
> "Much discussion was given to this element at oral argument. It is possible Juror F.W. was not aware she was

13

sued for debt in 2000 and again in 2021, or that she was sued for unlawful detainer in 2005 because these suits resulted in default judgments. However, for a default judgment to [be] entered, the court had to first determine that service, and thus notice, was perfected. As such, it is much more likely that she was aware of these suits. As to the 2008 unlawful detainer [action], it was dismissed without a judgment, and as such no assumption can be made. For Juror J.B., two of her suits for debt actually resulted in consent judgments and the third was dismissed. There is also evidence she worked as a legal secretary, which makes it hard to believe she didn't understand the question. Certainly, for the two judgments that required her consent, there is a definite presumption that she was aware she had been sued. The third was dismissed so no presumption can be made.

        "Materiality

        "Finally, and perhaps most importantly, the Court must weight [sic] the materiality of the question and topic at issue. In and of itself, prior litigation of a juror is certainly material. The question is asked in every civil action and in most criminal prosecutions. The fact that the question was asked by Plaintiff shows it is material, and it is entirely understandable that both sides always want to know if a juror has ever been sued."

Despite those findings, the trial court reluctantly denied Nissan's motion based on its belief that our prior decisions in Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So. 2d 1 (Ala. 2007), and Hood v. McElroy, 127 So. 3d 325 (Ala. 2011), precluded it from concluding that J.B.'s and F.W.'s failure to disclose their litigation histories was

14

objectively material. After asserting that the "prior litigation of a juror is certainly material," the trial court stated as follows:

"The subjects of the prior suits [against J.B. and F.W.], however[,] are not the same as the subject of this suit, and the fact that they are simple collections matters and unlawful detainers, as opposed to personal injury suits or complex products cases bears major consideration. In Hood[,] the Alabama Supreme Court reversed the trial court's order granting new trial upon a finding that a juror did not disclose two prior collections suits totaling $2,700.00:

"'The difference between the circumstances in [Colbert County-Northwest Alabama Healthcare Authority v. Nix, 678 So. 2d 719 (Ala. 1995),] and the circumstances in this case only widens when one considers the element of "materiality." The present action involves a wrongful death in which the damages claim was substantial. Similarly, in Nix, the action in which Juror Curtis's brother had been a defendant was a claim involving wrongful death; that case was settled for an amount in excess of $1,000,000. In contrast, in the present case, Juror J.S.'s failure to respond to the question at issue concerned the fact that she had been named as a defendant in two debt-collection actions in small-claims court that apparently had resulted in uncontested judgments against her totaling less than $2,700.'

Hood v. McElroy, 127 So. 2d 325, 334 (Ala. 2001). Nor does it seem to matter if the undisclosed action also involved a personal injury. See Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 5-6 (Ala. 2007), wherein the Court determined that an undisclosed prior personal injury suit by a juror who was hit by a car while riding a bike, in a case

15

involving a motorcycle driver hit by a truck, was significantly factually different and thus not material. The question of objective materiality seems to be governed by a very tight and narrow comparison.

"Based on all of the above, the Court finds that the two jurors absolutely should have disclosed their prior suits in response to Plaintiff's questions and that Defendants had every right to rely on their responses, or lack thereof. Despite this, and despite Defendants' subjective statement by the affidavit of their attorney (which the Court believes) that had they known of these suits these jurors would have been struck, the Court is bound by the precedent in Hood v. McElroy and Jimmy Day Plumbing & Heating, Inc. v. Smith, regarding materiality, even though it disagrees with the narrow view it must take."

(Footnote omitted; emphasis added.)

The trial court explained that, were it were not "bound" by the "narrow view" of materiality in Jimmy Day Plumbing and Hood, it would have reached a different result:

"If given a free hand, the [trial court] would grant the motion for new trial upon a finding that the failure of the two jurors to truthfully respond resulted in probable prejudice (both subjectively and objectively), that the prior undisclosed suits are material when taken in total, that enough of the prior suits are temporal, and that both jurors were aware of enough of them."

(Emphasis added.)

Finally, the trial court concluded that, given this precedent, it was

16

"bound" to conclude that it lacked the discretion to grant a new trial:

"However, given the precedent on materiality, the [trial court] feels that it can reach no conclusion other than it would be an abuse of discretion under the current law to find that the prior undisclosed suits are material, and that therefore it cannot find that there was probable prejudice from an objective standpoint. As such this basis for relief is DENIED and Defendants' motion for new trial is DENIED."

(Capitalization in original; emphasis added.)

In addition to denying the motion for a new trial, the trial court also denied Nissan's motions for a judgment as a matter of law and for a remittitur. Nissan filed its notice of appeal to this Court on February 26, 2024.

## Discussion

On appeal, Nissan argues that the trial court erred when it (1) refused to grant it a new trial based on J.B.'s and F.W.'s failure to disclose their litigation histories during voir dire, (2) concluded that the evidence presented at trial as to the existence of a defect was legally sufficient to support the jury's verdict, and (3) declined to remit the jury's damages award. Before we address the merits of Nissan's appeal, we must first determine whether we have appellate jurisdiction.

## I. Whether This Court Has Appellate Jurisdiction

This Court has repeatedly held that "[t]he filing of a timely notice of appeal is a jurisdictional act." <u>Painter v. McWane Cast Iron Pipe Co.</u>, 987 So. 2d 522, 529 (Ala. 2007). As noted above, the trial court entered a judgment on the jury's verdict in this case on June 19, 2023. On July 19, 2023, Nissan filed its renewed motion for a judgment as a matter of law and alternative motions for a new trial or for a remittitur. On August 3, 2023, the parties filed a joint stipulation to extend the time for ruling on the postjudgment motions to November 16, 2023. On October 11, 2023, the parties filed another joint stipulation to extend the time for ruling on the postjudgment motions by an additional 30 days -- until December 16, 2023. Then, on December 15, 2023, counsel for Alise filed a joint motion seeking to extend the deadline for ruling on Nissan's postjudgment motions until January 17, 2024. On January 16, 2024, the trial court entered its order denying Nissan's postjudgment motions. Nissan appealed 41 days later.

In her brief on appeal, Alise argues that Nissan's notice of appeal to this Court was not timely filed and that we consequently lack appellate jurisdiction over this case. Specifically, she contends that the joint motion filed on December 15, 2023, was ineffective in extending the time for

ruling on the postjudgment motions because (1) it was a joint "motion" rather than a "stipulation" and (2) it was filed after the original 90-day period for ruling on the postjudgment motions had expired. According to her, because the trial court failed to rule within the time permitted by the second extension agreement, the postjudgment motions were denied by operation of law on December 16, 2023. Thus, she says that Nissan's February 26, 2024, appeal -- filed more than 42 days after December 16, 2023 -- was untimely and that we lack jurisdiction to consider it.

Alise's challenge to our appellate jurisdiction is without merit. Rule 59.1, Ala. R. Civ. P., provides, in pertinent part, that

> "[n]o postjudgment motion filed pursuant to Rules 50, 52, 55, or 59[, Ala. R. Civ. P,] shall remain pending in the trial court for more than ninety (90) days, <u>unless with the express consent of all the parties</u>, which consent shall appear of record, or unless extended by the appellate court to which an appeal of the judgment would lie, and such time may be further extended for good cause shown. … A failure by the trial court to render an order disposing of any pending postjudgment motion within the time permitted hereunder, or any extension thereof, shall constitute a denial of such motion as of the date of the expiration of the period."

(Emphasis added.)

Nothing in Rule 59.1 requires that the "express consent" be memorialized in a "stipulation" or that it take any particular form. All

19

that the rule requires is that such express consent "shall appear of record." The joint motion in this case appears "of record," and the filing of the joint motion was a "positive step[] to express [an agreement to extend the 90-day period] in a direct and unequivocal manner." Personnel Bd. for Mobile Cnty. v. Bronstein, 354 So. 2d 8, 11 (Ala. Civ. App. 1977). Moreover, it was Alise who filed the joint motion. If there were any doubt, our recent opinion in Williams v. Dodd, [Ms. SC-2024-0704, Sept. 26, 2025] ___ So. 3d ___ (Ala. 2025), settled the matter. There, we explicitly concluded that a motion reflecting both parties' consent to extending the time for ruling on the postjudgment motion constituted "express consent" under Rule 59.1. Williams, ___ So. 3d at ___. Thus, the joint motion in this case reflected the parties' express consent to extending the deadline for ruling on the postjudgment motions and qualified as "express consent" for Rule 59.1 purposes.

As noted above, Alise additionally argues that, even assuming that the joint motion qualified as express consent, the December 15, 2023, joint motion was ineffective because it was not filed within the original 90-day period set forth in Rule 59.1. In other words, Alise contends that successive extension agreements must also be filed within the original 90

20

days to be effective. Alise's argument is entirely unmoored from the text of Rule 59.1, which provides -- without qualification -- that postjudgment motions may "remain pending" for longer than 90 days as long as the parties' "express consent" appears on the record. See Gregory C. Cook, Alabama Rules of Civil Procedure Annotated § 59.1.3 (5th ed. 2018) (explaining that Rule 59.1's language reflects that parties can "consent to extensions without limitation").

Further, although Alise cites Scheilz v. Scheilz, 579 So. 2d 674, 675 (Ala. Civ. App. 1991), for the proposition that successive extension agreements must all fall within the original 90-day period, that case says no such thing. Instead, Scheilz recognizes that, if an initial extension agreement is not filed within the original 90-day deadline, the trial court loses jurisdiction and the parties cannot extend the deadline for the first time after that 90-day period has run. Here, it is undisputed that the parties recorded their initial extension agreement before the 90-day deadline expired and that -- pursuant to the second extension agreement -- the trial court had jurisdiction over the case when the third extension agreement was filed on December 15, 2023. Thus, the December 15, 2023,

joint motion reflecting the parties' extension agreement was effective, and this Court has appellate jurisdiction over this case.

## II. Whether the Trial Court Was Mistaken When It Concluded That It Had No Discretion To Grant Nissan's Motion for a New Trial

Having determined that we have appellate jurisdiction, we now turn to the merits. On appeal, Nissan argues that the trial court's denial of its motion for a new trial was predicated on a misunderstanding of this Court's controlling precedent. Specifically, it contends that Jimmy Day Plumbing and Hood did not bind the trial court or deprive it of the discretion to determine whether the failure of the two jurors to disclose their litigation histories resulted in probable prejudice to Nissan. For the reasons explained below, we agree.

## A. The Trial Court's Discretionary Power

We begin our analysis with the well-established principle that granting or denying a motion for a new trial based on a juror's silence during voir dire rests within the sound discretion of the trial court. See Carter v. Henderson, 598 So. 2d 1350, 1354 (Ala. 1992). "[T]he core of 'discretion' as a jurisprudential concept is the absence of a hard and fast rule that fixes the results produced under varying sets of facts." Johnson

v. United States, 398 A.2d 354, 361 (D.C. 1979) (citing Langnes v. Green, 282 U.S. 531, 541 (1931)). Thus, "[w]hen a decision is within the trial court's discretionary powers, the trial court 'has the power to choose between two or more courses of action and is therefore not bound in all cases to select one over another.'" Swindle v. Swindle, 157 So. 3d 983, 992 (Ala. Civ. App. 2014) (quoting In re 2010 Denver Cnty. Grand Jury, 296 P.3d 168, 176 (Colo. App. 2012)).

While discretion implies that no particular outcome is mandated, that is not to say that a trial court's exercise of discretion is unbounded. The exercise of discretion must be "'"'based on facts and guided by law.'"'" Ex parte Dolgencorp, Inc., 13 So. 3d 888, 896 (Ala. 2008) (citations omitted). However, although legal principles guide a court's exercise of discretion, "the decision-maker, and not the law, decides." Johnson, 398 A.2d at 361 (citing Maurice Rosenberg, Judicial Discretion of the Trial Court, Viewed from Above, 22 Syracuse L. Rev. 635, 636-37 (1971)).

### B. The Freeman Factors

As noted above, discretion should be exercised within the framework of established legal principles. In exercising its discretion to

grant or deny a motion for a new trial that is based on a juror's failure to respond to a voir dire question, a trial court considers the relevant facts and asks whether the juror's nondisclosure resulted in probable prejudice to the movant. Freeman v. Hall, 286 Ala. 161, 166, 238 So. 2d 330, 335 (1970). "The form of prejudice that would entitle a party to relief for a juror's nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror." Ex parte Dobyne, 805 So. 2d 763, 772 (Ala. 2001).

In Freeman v. Hall, our Court articulated certain criteria to aid trial courts in their determination of whether probable prejudice exists. We explained that,

> "[a]lthough the factors upon which the trial court's determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about."

286 Ala. at 167, 230 So. 2d at 336 (emphasis added). With respect to the "materiality" factor, we have defined a material fact as "'"'one which an

attorney[,] acting as a reasonably competent attorney, would consider important in making the decision whether or not to excuse a prospective juror.'"'" Jimmy Day Plumbing, 964 So. 2d at 5 (citations omitted).

While the Freeman factors guide a trial court's discretionary determination of whether "probable prejudice" exists, a trial court is entitled to exercise its discretion in weighing the relevant legal criteria and facts to determine whether the totality of the circumstances merits a finding of probable prejudice and, thus, a new trial.

### C. Appellate Review of a Ruling on a Motion for a New Trial

Our Court reviews a trial court's ruling on a motion for a new trial for abuse of discretion. Freeman, 286 Ala. at 167, 238 So. 2d at 336. In Steele v. Gill, 283 Ala. 364, 369, 217 So. 2d 75, 80 (1968), we explained

> "that there is no hard and fast rule by which to determine whether a court has abused its discretion, that the reviewing court is never justified in substituting its discretion for that of the trial court, and that discretion is abused whenever, in its exercise, the court has acted arbitrarily without the employment of its conscientious judgment, or has exceeded the bounds of reason in view of all the circumstances, or has so far ignored recognized rules or principles of law or practice as to result in substantial injustice."

Thus, a trial court abuses its discretion when its exercise of discretion is arbitrary, unreasonable, or unsupported by legal principles.

25

Importantly, and as relevant here, a trial court also abuses its discretion when it fails to exercise discretion in a situation that calls for it. See 5 C.J.S. Appeal and Error § 826 (2019). "If a particular determination has been liberated from the stricture of a hard and fast rule and committed to the trial court's discretion, the essence of the decision-making is the trial court's judgment in exercising that discretion. An outright failure or refusal to exercise that judgment is wholly defeating." Johnson, 398 A.2d at 363. In other words, unless a single outcome is mandated by the controlling law, a trial court may not abdicate its duty to exercise discretion by purporting that its hands are tied by a rule of law. See Rosenberg, supra, at 666. Thus,

> "where a party has called upon the court for a discretionary ruling, it is improper for the court to refuse to utilize its right to decide the question as a matter of discretion. Purporting to be bound to rule as a matter of law will not satisfy the moving party's claim on the court's discretion."

Grow v. Wolcott, 123 Vt. 490, 492, 194 A.2d 403, 404 (1963). Significantly, "if the record clearly shows that the trial court failed to exercise its discretion, the appellate court can neither defer to an exercise of discretion that never occurred nor substitute its discretion for that of the trial court." 5 C.J.S. Appeal and Error § 826 (2019).

D. This Court's Decisions in Jimmy Day Plumbing and Hood
Did Not Divest the Trial Court of Its Discretionary Power
or Bind the Trial Court to Any Particular Result as to
Materiality or Probable Prejudice

As discussed above, in its order denying Nissan's motion for a new trial, the trial court considered the Freeman factors and expressed its personal view that those factors weighed in favor of granting a new trial based on a finding that the failure of the two jurors to disclose their litigation histories resulted in probable prejudice to Nissan.

Despite this, the trial court concluded that this Court's decisions in Jimmy Day Plumbing and Hood mandated only one outcome: the denial of Nissan's motion for a new trial. See trial court's order (stating that the trial court is "bound by the precedent in Hood v. McElroy and Jimmy Day" and that, "given the precedent on materiality, [the trial court could] reach no conclusion other than it would be an abuse of discretion under the current law to find that the prior undisclosed suits are material").

The question presented by this appeal is whether the trial court correctly concluded that our decisions in Jimmy Day Plumbing and Hood divested it of discretion by mandating only one legally permissible decision in this case.

1. Jimmy Day Plumbing

In <u>Jimmy Day Plumbing</u>, a motorcyclist suffered serious and permanent injuries after colliding with a truck. 964 So. 2d at 3. The motorcyclist filed suit, and a jury awarded him $1.5 million in compensatory damages. <u>Id.</u> A juror sitting in the action indicated that he had never sued anyone on a juror questionnaire and failed to respond when asked during voir dire whether he had ever filed a lawsuit. <u>Id.</u> at 4. After the defendant discovered that the juror had previously filed a lawsuit seeking damages for injuries sustained in a car accident, it filed a motion for a new trial. <u>Id.</u> The trial court denied that motion. <u>Id.</u>

On appeal, the defendant argued that similarities between the motorcyclist's accident and the accident involving the juror clearly established the materiality of the juror's undisclosed personal-injury lawsuit and that the juror's lawsuit was not temporally remote from his jury service in the case. <u>Id.</u> at 5. This Court, however, noted that there were "[s]ignificant factual differences" between the two accidents and held that "[t]he trial court, <u>acting within its discretion</u>, could have concluded that [the defendant's arguments were] rankly speculative and overlook[ed] substantial differences between [the juror's] accident and

[the motorcyclist's] accident." Id. at 6 (emphasis added). We further concluded that the "trial court, in the exercise of its discretion, was entitled to consider the length of time between the trial of th[e] case in March 2006 and [the juror's] accident in July 1997, in addition to the length of time between the trial of th[e] case and the conclusion of [the juror's] lawsuit in July 2001." Id. (emphasis added). We, thus, affirmed the trial court's exercise of its discretion in denying the motion for a new trial. Id.

In this case, the trial court misread our decision in Jimmy Day Plumbing as standing for the proposition that a juror's prior litigation history is always immaterial whenever that history involves a case that is factually distinguishable from the case being tried. Instead, the Jimmy Day Plumbing Court concluded only that the trial court acted within its discretion when it denied a motion for a new trial.

Crucially, affirming a trial court's exercise of discretion does not equate to declaring its decision as the only legally permissible outcome. Rather, it merely confirms that the trial court's decision falls within a range of permissible outcomes. Thus, the trial court in this case was mistaken in concluding that the precedent "regarding materiality" in

29

<u>Jimmy Day Plumbing</u> "bound" it to conclude that J.B.'s and F.W.'s failure to respond to the voir dire question did not result in probable prejudice to Nissan.

### 2. Hood v. McElroy

In its order, the trial court additionally stated that, because the lawsuits against J.B. and F.W. were of a different type than the lawsuit against Nissan, it was bound -- pursuant to our decision in <u>Hood</u> -- to deny the motion for a new trial. In <u>Hood</u>, the estate of a 14-month-old child who died from brain injuries inflicted by his mother's boyfriend brought a wrongful-death action against the boyfriend and a county social worker who had determined that it was safe to leave the child in his mother's care. 127 So. 3d at 327. During voir dire, counsel for the estate asked the venire the following question:

> "'How many of you have ever been defendants in a lawsuit? Had somebody sue you for personal injuries? And I'm not talking about a case like this. It could have been a car wreck.'"

<u>Id.</u> at 328 (emphasis omitted). A juror who had been a defendant in two small-claims collection actions in which a consent or a default judgment had been entered failed to respond to that question. <u>Id.</u> at 330.

The jury found for the estate, but only returned a $25,000 verdict. The estate (that is, the plaintiff) moved for a new trial based on the juror's failure to answer. Id. at 327. The trial court granted the motion for a new trial, finding that the temporal, ambiguity, inadvertence, and materiality factors set forth in Freeman all weighed in favor of finding that the nondisclosure resulted in probable prejudice to the estate. Id. at 331-32.

On appeal, this Court reversed the trial court's order granting a new trial. Id. at 336. Four Justices, in a plurality decision, asserted that they could not conclude,

> "even under the exceeds-its-discretion standard by which we evaluate the trial court's decision to grant a new trial, [that the juror's] failure to reveal, in response to the particular questions asked, that she had been sued for approximately $2,650 in two apparently uncontested small-claims-court collection actions provides adequate support for a finding of 'probable prejudice' so as to warrant retrying this case."

Id. at 333.

The plurality further explained that its "disagreement with the trial court's decision [to grant the motion for a new trial] focuse[d] primarily on the factors of 'ambiguity of the question propounded' and the 'materiality of the matter inquired about.' " Id. More specifically, the plurality took issue with the trial court's determination that the voir dire

31

question was unambiguous, explaining that "the inquiry as to having been a 'defendant[] in a lawsuit' was followed directly by the apparently explanatory companion question of whether the juror had '[h]ad somebody sue you <u>for personal injuries</u>?'" <u>Id.</u> After "[c]onsidering the query in its entirety, [the plurality] conclude[d] that in fact it was ambiguous as to whether the questioner was seeking information on any lawsuit of any nature or only lawsuits where a juror had been sued 'for personal injuries.'" <u>Id.</u> Thus, the plurality said, the juror's failure to respond to the voir dire question was understandable in light of the fact that "the only time she had ever been a defendant in a lawsuit was in two small-claims-court actions that did not involve personal injuries but merely the collection of debt that was not contested." <u>Id.</u>

Relatedly, and with respect to the "inadvertence or willfulness" factor set forth in <u>Freeman</u>, the plurality noted that "the difference in the wording of the questions at issue and the nature of the judicial proceeding with which [the juror] had been involved [was] such that [the plurality saw] little or no basis for inferring that [the juror] knowingly and willfully violated her oath when she failed to disclose the collection action[s] against her." <u>Id.</u> at 336.

The plurality also took issue with the trial court's analysis of the materiality factor. In particular, the plurality explained that, to warrant a new trial, a nondisclosure by a juror must be material in "<u>both</u> an objective sense and in the sense that the attorney for the moving party represents that it would have made a difference in the manner in which he or she would have exercised peremptory strikes." <u>Id.</u> at 335. The plurality underscored that the juror's undisclosed litigation history as a defendant involved two debt-collection actions in small-claims court -- actions that were very different from the wrongful-death action that the juror was being asked to decide -- and asserted that the materiality factor did not support the trial court's decision to grant a new trial. <u>Id.</u> at 334. Thus, based on "the specific facts of [<u>Hood</u>]," the plurality concluded that the estate had not made "a sufficient showing of 'probable prejudice' … to justify a decision to put all concerned to the time, effort, and expense of retrying [that] case." <u>Id.</u> at 336.

Concurring in the result, Justice Shaw identified only "[t]he ambiguous nature of the voir dire questions" and "the award in the estate's favor" as the reasons for his conclusion "that the trial court

33

exceeded its discretion in finding probable prejudice and in granting a new trial." Id. at 337.

The trial court in the present case misinterpreted the effect of our decision in Hood. Appellate review under the abuse-of-discretion standard is inherently fact-specific and context-dependent, especially when the trial court's exercise of discretion involves the application and weighing of many factors. See Valley Heating, Cooling & Elec. Co. v. Alabama Gas Corp., 286 Ala. 79, 82, 237 So. 2d 470, 472 (1970) ("An abuse of this discretion has been defined, in a legal sense, as exceeding the bounds of reason, all the circumstances before the lower court being considered." (emphasis added)). Indeed, the Hood plurality reversed the trial court's order granting a new trial based on a "review of the specific facts of th[at] case." 127 So. 3d at 336 (emphasis added).

The facts in Hood -- including those relevant to materiality -- are readily distinguishable from the facts in the present case. For instance, in Hood, only one juror failed to disclose the fact of two collection actions against her. Here, two jurors failed to disclose that corporations had brought seven lawsuits against them collectively, and one of those jurors had worked as a legal secretary.

34

The court in <u>Hood</u> also relied heavily upon the ambiguity of the voir dire question propounded to the jury in that case. Here, in contrast, the trial court expressly concluded that "[t]he question was not ambiguous and [that] the [it could not and would] not assume any juror was confused by such a simple question, asked three times without contradiction."

Moreover, the jury in <u>Hood</u> had ruled in favor of the party asking for a new trial. In contrast, the jury in this case rendered a verdict against the moving party.

And, to state the obvious, the main opinion in <u>Hood</u> was a plurality -- not a majority -- opinion. Ordinarily, a plurality opinion is not binding precedent. <u>See</u> <u>State v. The Boys & Girls Clubs of S. Alabama, Inc.</u>, 163 So. 3d 1007, 1012 (Ala. 2014) (recognizing that a plurality opinion "does not represent binding precedent"). Further, although Alise contends that the trial court properly treated the plurality opinion as binding because, she says, Justice Shaw agreed "with the plurality that nondisclosure[s] of small[-]claims court proceedings do not tend to indicate probable prejudice," Alise's brief at 31, Justice Shaw's special writing does not support that characterization. As previously noted, in his special writing, Justice Shaw explained that he would reverse the trial court's order

35

granting a new trial based solely on the ambiguity of the voir dire questions and the plaintiff's favorable verdict, and he explicitly declined to address any other issues. See Hood, 127 So. 3d at 337 (Shaw, J., concurring in the result) ("Because I would reverse the trial court's order granting a new trial solely for the reasons stated herein, I see no need to address other issues."). Justice Shaw's special writing neither mentioned the plurality opinion's materiality analysis nor adopted any general proposition that the nondisclosure of small-claims actions does not tend to indicate probable prejudice.[8] Thus, even assuming that the plurality's materiality reasoning was not limited to the facts in Hood, it cannot be regarded as binding precedent, and the trial court in this case was mistaken when it wrote that it was "bound by the precedent in Hood … regarding materiality…." (Emphasis added.)

---

[8]While the trial court is not bound by a plurality opinion of our Court, it is free to consider that opinion in exercising its discretion. Indeed, a plurality opinion "can still be cited for its persuasive value," and it is possible that the rationale set forth in a plurality opinion "will later become the rationale of the court in a majority opinion." Justice Jay Mitchell & Lars A. Longnecker, How to Read A Vote Line of the Alabama Supreme Court, 84 Ala. Law. 146, 151 (2023)

Because the trial court denied Nissan's motion for a new trial based on its erroneous belief that this Court's decisions in <u>Jimmy Day Plumbing</u> and <u>Hood</u> required it to rule in a particular way as a matter of law, it failed to exercise its discretion regarding a discretionary matter. We note that "'[t]he trial court is in the best position to determine whether there was probable prejudice as a result of a juror's failure to respond to questions during voir dire.'" <u>Jimmy Day Plumbing</u>, 964 So. 2d at 4-5 (quoting <u>Land & Assocs., Inc. v. Simmons</u>, 562 So. 2d 140, 149 (Ala.1989)). Accordingly, we reverse the trial court's order denying Nissan's motion for a new trial and remand the case for the trial court to exercise its discretion in considering Nissan's motion for a new trial.[9]

### III. <u>Whether the Trial Court Erred in Denying Nissan's Renewed Motion for a Judgment as a Matter of Law</u>

Nissan separately challenges the trial court's denial of its renewed motion for a judgment as a matter of law. This Court has explained that, to prevail on an AEMLD claim, a plaintiff must establish that the product

---

[9]As previously noted, on appeal Nissan alternatively argues that the trial court erred in declining to remit the $8.5 million damages award. In view of our holding regarding Nissan's motion for a new trial, we pretermit discussion of whether Nissan was entitled to a remittitur.

at issue was sold in "a defective condition that made the product unreasonably dangerous to the ultimate user or consumer," Bell v. T.R. Miller Mill Co., 768 So.2d 953, 957 (Ala. 2000), and that "this is done by proving that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the allegedly defective product." McMahon v. Yamaha Motor Corp., U.S.A., 95 So. 3d 769, 772 (Ala. 2012). The existence of a safer, practical, alternative design may, in turn, be established by presenting evidence indicating "(1) that the injuries inflicted by the product would have been less severe or eliminated by the use of the alternative design and (2) that the utility of the alternative design outweighed the utility of the design actually used." Hosford, 223 So. 3d at 203.

On appeal, Nissan argues that it is entitled to a judgment as a matter of law because, it says, Alise failed to meet her burden of presenting substantial evidence to prove liability under the AEMLD. Specifically, Nissan challenges the sufficiency of Broadhead's testimony regarding alternative design. Although Nissan does not dispute that Broadhead was qualified to provide expert opinions on the issue of alternative design, it argues that his testimony was based on speculation

and conjecture and did not rise to the level of substantial evidence.

As previously discussed, at trial Broadhead identified four purportedly safer alternative designs for the airbag system that caused Alise's injuries. By denying Nissan's renewed motion for a judgment as a matter of law, the trial court clearly concluded that there was a jury question on at least one of the alternative-design theories presented at trial. Based on our review of the record, we agree with the trial court.

We note that, in reviewing a ruling on a motion for a judgment as a matter of law, this Court "views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw." Waddell & Reed, Inc. v. United Invs. Life Ins. Co., 875 So. 2d 1143, 1152 (Ala. 2003). The record in this case reflects that Broadhead testified that airbag deployment at a 9.1 barrier equivalent velocity was inappropriate for a seated occupant and that a dual-threshold airbag system would have had a higher firing threshold for belted occupants like Alise. As Broadhead explained,

> "[i]f you have your seatbelt on, you don't need an airbag in low speed collisions. Your seatbelt's gonna protect you up to 15, 20 miles an hour, maybe. But in low speed collisions, if you've got your seatbelt on, you're -- you're good to go. You don't need the danger of the airbag in these low speed collisions. So why not

-- You know how your car tells you you don't have your buckle -- your belt buckled, there's -- easy to put a switch in there. And that signal, yes or no the belt is buckled, can go to the sensor. The single point sensor that they had in their computer program and it can have a line of code in the computer program, is -- is the belt buckled; is it not buckled. If it's buckled, make the threshold higher. If it's not buckled, maybe you need an airbag down at 10 miles an hour."

Broadhead further testified that, had the Infiniti's airbag not deployed, Alise would not have been injured and that dual-threshold airbag systems were used in the industry at the time the subject Infiniti was manufactured. Although Nissan contends that Broadhead's testimony did not establish that the Infiniti's deployment threshold was unreasonably dangerous or that a dual-threshold system could have avoided Alise's injuries, we believe that a reasonable jury could infer from the testimony admitted into evidence in this case (1) that the Infiniti's deployment threshold was too low for belted occupants, (2) that a dual-threshold airbag system would have shifted the deployment threshold upward for belted occupants, (3) that a dual-threshold airbag would not have deployed in this accident, and (4) that Alise, in turn, would not have been injured.

The record also reflects that Broadhead testified (1) that, to prevent

Alise's head and face from being in the path of the deploying airbag, the latest allowable airbag-deployment time should have been 19 milliseconds; (2) that Nissan's own internal-testing documents and testimony from Nissan's person most knowledgeable established that the subject airbag was designed to fire as late as between 63 milliseconds and 101 milliseconds after impact; (3) that the pattern of makeup transfer on the airbag was forensic evidence showing that the subject airbag hit Alise while it was still unfolding; (4) that crush-zone sensors in the front of a vehicle could have sensed the collision and fired the airbag more quickly than the subject Infiniti's single compartment sensor; and (5) that NHTSA data reflected that the majority of cars manufactured in 1998 had crush-zone sensors. Based on the arguments and testimony admitted into evidence in this case, we believe that a jury could reasonably conclude that (1) the Infiniti's airbag deployed too late, (2) that the delayed deployment was the result of inadequate crash sensors on the Infiniti, (3) that implementing crush-zone sensors in the front of the Infiniti would have sped up deployment, and (4) that additional crush-zone sensors were an economically and technologically feasible alternative design that would have mitigated Alise's injuries.

Viewing the foregoing evidence in the light most favorable to Alise, we conclude that Broadhead's testimony sufficiently established the existence of at least one safer, practical, alternative design that would have mitigated or prevented Alise's injuries and that Alise met her burden of presenting substantial evidence in support of her AEMLD claim. We, thus, affirm the trial court's order denying Nissan's renewed motion for a judgment as a matter of law.

## Conclusion

In sum, we affirm the trial court's denial of Nissan's renewed motion for a judgment as a matter of law, but we conclude that the trial court failed to exercise its discretion in ruling on Nissan's motion for a new trial. For that reason, we reverse the denial of Nissan's motion for a new trial and remand the case for proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Stewart, C.J., and Wise, Bryan, and Lewis, JJ., concur.

Cook and McCool, JJ., concur specially, with opinions.

Shaw, J., concurs in the result, with opinion.

Sellers and Mendheim, JJ., concur in the result.

COOK, Justice (concurring specially).

Given existing Alabama precedent and the findings of fact and statements made by the trial court in its order on Nissan's motion for new trial, I believe that the main opinion is a straightforward application of well-settled principles of Alabama law. Thus, I concur fully with the main opinion's analysis. However, I write specially to raise the question of whether our Court should revisit the standard for granting a new trial based on a juror's failure to disclose information during voir dire -- something not raised by either party in this appeal.

As explained in the main opinion, under existing Alabama law, "[w]hen the trial court is presented with a new trial motion based upon either an improper or a nonexistent response to a voir dire question, 'the court must determine whether the response or lack of response <u>has resulted in probable prejudice to the movant</u>.'" <u>Continental Eagle Corp. v. Mokrzycki</u>, 611 So. 2d 313, 318 (Ala. 1992) (quoting <u>Eaton v. Horton</u>, 565 So. 2d 183, 185 (Ala. 1990)) (emphasis added).

Moreover, "[t]he form of prejudice that would entitle a party to relief for a juror's nondisclosure or falsification in voir dire would be its effect, if any, to <u>cause the party to forgo challenging the juror for cause or</u>

44

exercising a peremptory challenge to strike the juror." Ex parte Dobyne, 805 So. 2d 763, 772 (Ala. 2001) (emphasis added). In other words, to establish that probable prejudice exists, a movant need demonstrate only that the outcome of jury selection would have been different -- not that the outcome of the trial would have been different. Id.

I think it is legitimate to ask whether the existing probable-prejudice standard makes it too easy to obtain a new trial -- something that could ultimately hurt plaintiffs or defendants. See, e.g., Hood v. McElroy, 127 So. 3d 325 (Ala. 2011) (plurality opinion) (plaintiff moved for new trial); Noble Trucking Co. v. Payne, 664 So. 2d 202 (Ala. 1995) (plaintiff moved for new trial); Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So. 2d 1 (Ala. 2007) (defendant moved for new trial); Holly v. Huntsville Hosp., 925 So. 2d 160 (Ala. 2005) (defendants moved for a new trial).

Trials are exceptionally expensive for the parties. Trials are a substantial investment of time and energy by the court system and by members of the public who must serve as jurors. In short, it is a really big thing to require an entirely new trial. Of course, there will be important reasons that justify requiring a new trial in some

cases. However, I believe it is time that we reconsider exactly what must be demonstrated before granting a new trial based on a juror's failure to disclose information during voir dire.

In contrast to Alabama precedent, federal precedent states that a party seeking a new trial must demonstrate two elements: (1) that a juror failed to answer honestly a material question during voir dire and (2) that a correct response would have provided a valid basis <u>for a challenge for cause</u>. <u>See</u> <u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548, 556 (1984). In <u>McDonough</u>, the United States Supreme Court further explained that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." <u>Id.</u> In other words, that court recognized that, if the undisclosed information would not have justified removing the juror <u>for cause</u>, then the nondisclosure was unlikely to have affected the trial's fairness or outcome.

Our prior caselaw has not embraced the above-mentioned principle, and, under Alabama law, probable prejudice may be established if the nondisclosure affected <u>either</u> the party's ability to challenge the juror for cause <u>or to exercise a peremptory strike</u>. Thus, the federal standard

imposes a higher burden of proof on the movant, requiring a showing of both dishonesty and a valid basis for a challenge for cause.

I have no present opinion about whether Alabama should adopt this federal standard or some modified version of it. Or perhaps there is a suitable standard from another state that we may want to consider adopting. But, I do believe that our Court should have this discussion, and I urge the bar to raise this issue in a future appropriate case.

McCOOL, Justice (concurring specially).

I concur fully with the main opinion. I write specially to emphasize the fundamental importance of truth and candor in the jury-selection process of our civil- and criminal-justice system.

Our jury-based system of achieving justice is indeed rare in the world today. In very few countries are regular citizens called upon to make decisions of the most fundamental importance. In most of Europe, verdicts such as the one before us are rendered primarily by civil magistrates or judges. In Muslim countries, sharia law dictates that qadis (judges) hand out justice. In this country, however, juries composed of laypeople decide legal disputes of great importance, often involving significant sums of money or the deprivation of an individual's freedom or even life. I am convinced that it is the jury system, more than any other aspect of our constitutional republic, that keeps our citizens free and ensures our basic freedoms.

However, this system only works if a jury is impartial, and it is therefore axiomatic that the process of "selecting" a jury be free from taint. As this Court explained in Western Railway of Alabama v. Mutch, 97 Ala. 194, 200, 11 So. 894, 896-97 (1892):

>"Trial by jury is a bulwark of American, as it has long been of English, freedom. It wisely divides the responsibility of determinative adjudication, of punitive administration, between the judge, trained in the wisdom and intricacies of the law, and 12 men chosen from the common walks of nonprofessional life; chosen for their sound judgment <u>and stern impartiality</u>."

(Emphasis added.) And the method by which we ensure an impartial, untainted jury is through the jury-selection process, whereby the attorneys for each party question the prospective jurors during voir dire and rely on their answers to ultimately select which veniremembers will serve on the jury. See <u>Vivion v. Brittain</u>, 510 P.2d 21, 24 (Wyo. 1973) ("The method of determining if a juror is qualified and can reasonably be expected to be fair and impartial is through voir dire examination."); and <u>Azucena v. State</u>, 135 Nev. 269, 273, 448 P.3d 534, 538 (2019) (noting that "'a truly impartial jury, whether the action is criminal or civil, is so basic to our notion of jurisprudence that its necessity has never really been questioned in this country'" and that "[t]he voir dire process is a crucial means of ensuring … an impartial jury" (citation omitted)).

To be precise, attorneys in Alabama do not "select" a jury; they "strike" it by removing those members of the venire that they do not believe would be fair and impartial to their clients. There are two

49

methods of striking a prospective juror under Alabama law: challenges for cause and peremptory strikes. Challenges for cause are primarily defined by statute, see § 12-16-150 through § 12-16-152, Ala. Code 1975, though a trial judge "'may remove a potential juror if probable prejudice exists, even if none of the statutory grounds apply.'" Peraita v. State, 897 So. 2d 1161, 1218 (Ala. Crim. App. 2003) (citation omitted). Peremptory strikes, on the other hand, are exercised at the discretion of the attorneys and may be used for any reason or even no reason, subject to constitutional limitations. See, e.g., Batson v. Kentucky, 476 U.S. 79 (1986) (holding that it is unconstitutional to base peremptory strike on race); and J.E.B. v. Alabama, 511 U.S. 127 (1994) (holding that it unconstitutional to base peremptory strike on gender). This type of strike allows an attorney to remove those prospective jurors whom he or she does not want on the jury, perhaps because the attorney picks up on a bias that, while not favorable to his or her client, does not rise to the level of a challenge for cause.

In my estimation, peremptory strikes are just as important as challenges for cause. Indeed, "a principal reason for [peremptory strikes] [is] to help secure the constitutional guarantee of trial by an impartial

jury." <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 306 (2000). As a matter of fact, in my experience, a jury is struck primarily through the attorneys' use of peremptory strikes rather than through successful challenges for cause, which might not even be used at all in some cases. And, significantly, one of the most important bases for both peremptory strikes and challenges for cause are the answers that each side receives (or does not receive) from the prospective jurors during voir dire. Thus, when prospective jurors do not answer the questions they are asked, or do not answer truthfully, this entire process can be confounded, even if the nondisclosure does not concern an issue that would have risen to the level of a challenge for cause.

In my experience, one of the most significant moments in a jury trial in Alabama occurs at the end of the jury-striking process, when the jury is seated in the box and the trial judge looks at each attorney and asks, "Is this the jury you struck?" When the attorney rises and answers, "Yes, Your Honor," implicit in that answer is the attorney's belief that he or she has struck the best possible jury for his or her client. That belief is based in large part on the purportedly true and complete answers that the jurors provided during voir dire. In this case, however, two jurors

should have responded affirmatively, but did not, when asked a certain question by the plaintiff's attorney during voir dire, and the trial court was understandably concerned that the defendants might not have been able to strike a fair and impartial jury as a result of those jurors' nondisclosure.

To be clear, the mere fact that two jurors were not forthcoming during voir dire does not in and of itself mean that the defendants are entitled to a new trial, and I express no opinion on that issue. See Holly v. Huntsville Hosp., 925 So. 2d 160, 162 (Ala. 2005) ("'Not every failure of a juror to respond properly to a question propounded during voir dire automatically entitles a party to a new trial.'" (citation omitted)). Rather, that is a question for the trial court to decide on remand. However, the fact that those two jurors did not disclose specific information that they were clearly and unequivocally asked to disclose certainly raises the possibility that the jury that decided this case was not fair and impartial. Thus, I concur in this Court's decision to reverse the order denying the defendants' motion for a new trial and to remand the case for the trial court to reconsider that motion in light of this Court's explanation that

the trial court has the discretion to grant the defendants a new trial should it determine one is warranted.

SHAW, Justice (concurring in the result).

I respectfully concur in the result. Further, as to Part II. of the "Discussion" portion of the main opinion, I am not convinced that we should characterize the trial court's denial of the motion for a new trial as failing to exercise its discretion. It made a decision, but that decision was based on an erroneous legal premise, that is, what prior caselaw required.

"The proper exercise of judicial discretion ... '"'is the exercise of judicial judgment, based on facts and <u>guided by law</u>.'"'" <u>Ex parte Dolgencorp, Inc.</u>, 13 So. 3d 888, 896 (Ala. 2008) (emphasis added; internal citations omitted). "A court exceeds its discretion when its ruling is based," among other things, "on an erroneous conclusion of law." <u>Edwards v. Allied Home Mortg. Cap. Corp.</u>, 962 So. 2d 194, 213 (Ala. 2007). Here, as the main opinion explains, the trial court misunderstood the impact of prior caselaw on its decision.